Filed 9/11/25  In re Y.B. CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re Y.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>F.B.,<br><br>    Defendant and Appellant. | E085537<br><br>(Super.Ct.Nos. J301620 & J301660)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Cecelia E. Rutherford, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Helena Rho, Deputy County Counsel for Plaintiff and Respondent.

1

Defendant and appellant F.B. (Father) appeals from the juvenile court's dispositional order denying him reunification services with his 15-year-old daughter, L.B., after he severely sexually abused another one of his teenage daughters, L.B.'s older half-sister, Y.B., beginning when Y.B. was 15 years old. (Welf. & Inst. Code, § 361.5, subd. (b)(6).[1]) Father's various challenges to the juvenile court's order are without merit. We therefore affirm the order.

## BACKGROUND

In July 2024, plaintiff and respondent San Bernardino Children and Family Services (CFS) received an immediate response referral to investigate allegations that Father had been severely sexually abusing Y.B. for two years, since Y.B. was 15 years old. A social worker responded to the Montclair Police Department, where Y.B., who was 17 years old at the time, reported the abuse. The abuse included Father digitally penetrating Y.B.'s vagina and touching her on her breast. A peace officer relayed that Y.B. had run away from home six times in 2023 and twice in 2024. Y.B. lived in the home with Father, Father's wife M.E. (Stepmother), and Father and Stepmother's teenage daughters, C.B. and L.B. Father was arrested on charges of sexual penetration of a minor age 14 years or older, perpetrated by use of force, duress, or menace. (Pen. Code, § 189, subd. (a)(1)(C).)

Y.B. had resided with Father, Stepmother, and her half-siblings since she was nine years old, after she was removed from her mother's custody in dependency proceedings.

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise specified.

Y.B. reported that when she was 15 years old, Father began asking her what color lingerie she wore and " 'check[ing] [her] for hickies.' " Father would lift up her shirt, exposing her chest. Father's salacious conduct with Y.B. degraded to frequent, sometimes daily instructions to remove her bra on the pretense of inspecting her body for hickies. Y.B. reported a particular incident in June 2024 in which Father touched her breast and " 'put his hand in [her] private area.' " He inserted his finger inside her vagina. When Y.B. told Father to stop, he nevertheless continued and blamed her for the abuse, telling her in Spanish, "[N]o cumples con lo que dices," which CFS translated to "you don't fulfill what you say." Father directed Y.B. to sleep in "loose shorts" or without underwear to make it "easier for him" to access her body. The abuse occurred typically around 1:00 a.m. in the living room, as often as four times a week. Y.B. had to sleep in the living room "as a form of discipline" imposed by Father and Stepmother.

Stepmother confirmed that Y.B.'s behavior had begun to change about two years earlier. Y.B. started to skip school, run away from home, send inappropriate photographs of herself to others via text messaging, and have sex with a teenage peer. Father and Stepmother had moved Y.B.'s sleeping arrangement to the living room when they discovered her one night with a teenage boy. Stepmother explained the move was to prevent Y.B. from "sneaking in boys into the bedroom" that she shared with C.B., who was also 17. Stepmother believed Y.B. ran away most recently because she was not allowed to go to a party. Y.B. reported to CFS that she had been gone for three weeks.

Stepmother acknowledged that Y.B. disclosed to her that Father touched her inappropriately under her shirt, but she did not believe the allegation because Stepmother

3

ascribed it to when Y.B. had a fever. Stepmother said no abuse could have occurred then because she was present and Father only touched Y.B. on her cheek, neck, and chest to check her temperature. Stepmother insisted Y.B. fabricated the abuse allegation in "retaliation" against parental discipline.

In a later interview with the social worker, Stepmother "denied she said she [did] not believe the allegations." Instead, she now stated, "I can't say yes or no, without proof, for me I would say it's not true, but I don't know, I can't be with them 24/7." She acknowledged the social workers were "doing their job and . . . removed [the children] because they thought the girls are in danger." CFS detained Y.B. with a nonrelative foster caregiver in a group home, and placed C.B. and L.B. with their adult sister.

Stepmother had been in a relationship with Father for 30 years and had " 'never seen anything wrong' " to suspect abuse. But she recognized she had " 'never been in this situation' " and was willing "to participate in classes" to educate herself. She explained that C.B. and Y.B. were approximately the same age because Father had an extramarital affair with Y.B.'s mother. He "eventually acknowledged" the affair and stated as to Y.B. that "it was his responsibility to take care of his child."

Father denied any abuse in multiple interviews with social workers. He claimed Y.B. "made up" the allegations. He denied knowing what the criminal charges against him were or whether they were serious because he "cannot read in English." He reported that Y.B. had behavioral problems, including that she "brought boys into the home," she did not like to follow rules, and she did not like school. He claimed he treated Y.B. just as he treated his other daughters, including when his oldest daughter, now an adult, "also

4

had behavior problems when she was 17 years old." He labeled Y.B. as "smart, but lazy," and implied her report of abuse was payback for discipline. He said she "ran away from home and thought it would be easy to go live with a friend, but she doesn't realize there are rules everywhere."

C.B. and L.B. denied being abused by Father. They claimed Y.B. was safe in his care as well. C.B. acknowledged that Y.B. disclosed abuse to her "once" when Y.B. told her she was uncomfortable around Father, "but did not explain why."

CFS filed a dependency petition as to Y.B. and a separate petition as to C.B. and L.B. The core allegation of each petition was that Father sexually abused Y.B. "on more than one occasion" and did so with "unlimited access to the children" despite Stepmother's presence. As a result, CFS sought the juvenile court's protection for all three teens on grounds that included failure to protect, direct harm by sexual abuse or risk of sexual abuse, and indirect harm by abuse or neglect of a sibling. (§ 300, subds. (b), (d), (j).)

The juvenile court held a jurisdiction hearing regarding C.B. first, because she was about to turn 18 years old. C.B. had reported to CFS that when she reached 18, she wanted her case closed and she intended to return home to live with Father. At C.B.'s jurisdiction hearing, Father responded "no contest" to the court's inquiry regarding whether he disputed the allegations supporting jurisdiction over C.B. on grounds of abuse of a sibling. (§ 300, subd. (j).) He waived his right to contest the jurisdictional finding. As a result, CFS dismissed its remaining jurisdictional allegations in reference to C.B. only, and the juvenile court set a disposition hearing for her that is not in the record on

5

appeal.[2]  In effect, for purposes of this appeal, the dependency proceedings continued solely as to Y.B. and L.B.

CFS continued its investigation for the pending, combined jurisdiction hearing regarding Y.B. and L.B.  CFS obtained the full police report from Y.B.'s initial report of abuse.  Y.B. told the peace officer who interviewed her that the abuse began when she was 15 years old.  Father touched her "repeatedly" in a sexual manner, including by "intentionally grop[ing] her breasts" under her bra, and he warned her, " 'This is only between me and you, nobody has to know.'"  He pretended to be looking for hickies left by "other men."  The abuse increased to include digital penetration.  Y.B. recalled one instance during which Father told her, " 'I'm doing this so when you have sex, I want you to know what good feels like.' "  Father ignored Y.B.'s attempts to push his hand away and her verbal pleas to stop.

Y.B. grew more afraid of continued abuse when Father told her to " '[s]leep in loose shorts so it can be easier for me to stick my hand in later.' "  She recalled six separate occasions of similar abuse in the six months before she ran away for the last time in early June 2024.  She told Stepmother about the abuse, but Stepmother did not believe her.  Y.B. told her sisters about the abuse, but she believed they wanted her to ignore it.  Y.B. had been accompanied to the police station by the mother of a male friend; the mother initiated the abuse report.

---

[2]  The record does reflect that C.B. refused the option "to continue her case open and participate in Extended Foster Care."

Y.B. similarly described the abuse in a subsequent forensic interview. The abuse occurred in the living room where she slept and on at least one occasion in a parking lot where Father was teaching her how to drive. The "fingering" incidents caused vaginal irritation and a burning sensation when she urinated. She removed her hand when Father would place it on his crotch over his shorts. Father warned her "not to say anything" about his actions. He told her that if her boyfriend "did not want to do 'things' she wanted, she could do it with him." He extracted a " 'pinky promise' " from her not to disclose the abuse.

Father's court-approved predisposition services included individual counseling. He completed eight sessions, and neither the counselor nor Father requested more. The therapist considered the "therapeutic objectives [to] have been completed," where, "based on what [F]ather shared, he understands boundaries and maintained he did not touch [Y.B.] inappropriately." The therapist "clarified her role" was "not to get him to admit" abuse and that she could not "keep him in therapy if he does not say he did anything." When the social worker asked the therapist "if [F]ather would be a risk to his daughters," she declined to opine; she answered only that Father's self-report indicated he "understands boundaries."

Father had a private psychological exam performed regarding, in particular, whether he would benefit from reunification services. Other target focal points for the exam, as set by Father, included whether reunification services would prevent "re-abuse or neglect of the minor" and recommendations for reunification services, if it were determined he would benefit from them. The report did not consider whether

7

reunification services were in Y.B.'s or L.B.'s best interests. Father denied touching Y.B. inappropriately, denied in particular searching her for hickies, and denied making any inappropriate statements.

The exam report indicated that Father presented in his interview as "open" and "cooperative," and he appeared to be "willing to do what is asked of him," given his previous completion of the eight counseling sessions with the other therapist and eight of 12 parenting classes. Father reported he was able to identify boundaries and "how to prevent inappropriate behaviors in his home." While Father denied culpability, the examiner noted it was "common that individuals do not admit fault, especially in sexual abuse cases, for various reasons," but that failure did not "preclude them from gaining insight and benefitting from therapy."

The evaluator concluded Father could benefit from reunification services, as he "already benefitted from therapy, as noted by his therapist" after the eight sessions. The evaluator opined that Father understood boundaries, "especially" as to L.B., given that she "was not alleged to be a victim of the abuse." The evaluator opined, based on: (1) "the therapy [Father] has received," (2) the family history as discussed with Father, and (3) an absence of "present or persistent disorders" disclosed in the exam, that it was "unlikely" Father would "abuse or neglect [L.B.] in the future." The evaluator was not asked to address the likelihood of re-abuse of Y.B. or whether that abuse occurred. If L.B. were returned to Father's care, the evaluator recommended "8 more therapy sessions to manage the transition."

In her interview with CFS before the jurisdiction hearing, Y.B. was "adamant" that she did not want to visit Father or Stepmother or return to their care. She referred to Stepmother as "[M]om" and reported that "sometimes they argue and sometimes things are just fine" in their relationship, but she stressed she did not feel safe with Father in the home. She would turn 18 years old a month after the scheduled jurisdiction hearing and wanted to remain in extended foster care.

When the social worker interviewed L.B., who was 15 years old, L.B. became emotional and said "this" had been "very difficult for her and she just wants to go home[,] back with her parents." She felt safe with them.

CFS recommended against reunification services for Father based on the evidence that he abused Y.B. and the danger he posed in targeting one of his own daughters, already suffering from "past trauma" due to a prior dependency. With Father so "lack[ing] any insight," CFS concluded his prognosis for safe return of the children was "poor."

At the jurisdiction hearing, all counsel stipulated that if L.B. were called to testify, she would do so consistent with what she told CFS. This included that she wanted to return home, where she did not experience at Father's hands "anything like what [Y.B.] reported," "did not see anything to make her believe that anything like that was happening to [Y.B.], and Y.B. "never told her anything was happening" to her.

Father did not testify. Father's counsel called Y.B. to testify and, following the close of her testimony and argument by counsel, the juvenile court found Y.B. "very articulate" and "well spoken." The court found her abuse allegations "completely

9

credible" by "clear-and-convincing evidence." The court sustained the dependency petitions as to both Y.B. and L.B., and bifurcated their disposition hearing to a later date.

By the date of the disposition hearing in February 2025, Y.B. had turned 18 years old, was thriving in her foster home, and agreed to extended foster care. The disposition hearing, therefore, proceeded solely as to L.B.

The psychologist who performed Father's private evaluation testified. She noted that his testing results showed no indication of substance abuse, anger issues, or any identifiable personality disorders. In her estimation, Father had an open and honest attitude during the testing. She opined that Father was a low risk for engaging in further abuse. She also concluded he had the ability to benefit from services, and recommended services including therapy and parenting classes. On cross-examination, Father's expert admitted that the "tests" she administered to Father did not address sexual attraction to minors, sexual attraction to one's own biological children, pedophilia, sexual abuse recidivism, nor predictors for future sexual abuse when a perpetrator had a previous victim.

Following argument by counsel, the juvenile court ordered, in relevant part, "reunification services . . . for Mom for [L.B.]," but decided: "Reunification services will not be ordered for [Father]." The court explained in its detailed oral ruling that it found "by clear-and-convincing evidence the (b)6 provisions of severe sexual abuse [applied], mainly that [Y.B.] at 15 years of age was approached by Dad regarding showing lingerie, regarding him looking for hickeys, lifting up her shirt, removing her bra, touching her bare chest, digitally penetrating her vagina, having her wear either no underwear or loose

10

shorts so at night he can be a predator and have access to her for his ease taking place at one o'clock a.m. when people were sleeping or in a car away from everyone so that [Y.B.] could not get help, [and he] made her touch his genitals over his clothing."

Against this backdrop, the court expressly found against reunification services for Father with L.B. "because this comprise[s] severe sexual abuse." The court explained it considered "the circumstances under which the abuse o[r] harm was inflicted," which was "untenable for a young child," illustrated in part by the fact that, "though she testified very calmly, [Y.B.] at times broke down showing severe emotional trauma." The court acknowledged "[w]ith regard to [L.B.], the Court does not find history of abuse to the other children. [Y.B.} was the main target." Based on all the foregoing, the court found "there's no likelihood that [L.B.] would be returned safely within 12 months" to Father's care, given "the predatory act of abuse displayed by Father." The court further recognized "that [L.B.] wants to go home," but concluded "beyond reasonable doubt that's not in her best interest."

## DISCUSSION

Father contends the evidence does not support the juvenile court's order denying him reunification services with L.B. We disagree.

Severe sexual abuse of a child is among the statutory exceptions under which the juvenile court may bypass reunification services for an offending parent. (§ 361.5, subd. (b)(6).) The bypass expressly extends to protecting dependent siblings and half-siblings who were not themselves subjected to the sexual abuse. Specifically, "[r]eunification services need not be provided to a parent . . . when the court finds, by

clear and convincing evidence, any of the following:  [¶] . . . [¶]  (6) That the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse . . . [of] the child, a sibling, or a half sibling by a parent . . . , and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian."  (§ 361.5, subd. (b).)

Father does not challenge the juvenile court's finding that the severe sexual abuse prong of the foregoing language applied.  That prong is satisfied as follows:  "A finding of severe sexual abuse, for the purposes of this subdivision, may be based on, but is not limited to, sexual intercourse, or stimulation involving genital-genital, oral-genital, anal-genital, or oral-anal contact, . . . between the parent . . . and . . . [the] half sibling of the child . . . or the penetration or manipulation of the . . . half sibling's genital organs . . . by any animate . . . object for the sexual gratification of the parent."  (§ 361.5, subd. (b).)

In a separate subdivision, the statute sets forth factors relevant to determining the second prong for bypass when there has been severe sexual abuse, namely, the child's best interests.  (See § 361.5, subd. (i).)  The court considers "any information it deems relevant, including the following factors:  [¶]  (1) The specific act or omission comprising the severe sexual abuse . . . inflicted on . . . the child's . . . half sibling.  [¶]  (2) The circumstances under which the abuse . . . was inflicted on . . . the child's ... half sibling. [¶]  (3) The severity of the emotional trauma suffered by the . . . the child's . . . half sibling.  [¶]  (4) Any history of abuse of other children by the offending parent or guardian.  [¶]  (5) The likelihood that the child may be safely returned to the care of the offending parent or guardian within 12 months with no continuing supervision.

12

[¶] (6) Whether or not the child desires to be reunified with the offending parent or guardian." (*Ibid*.)

If the juvenile court determines section 361.5, subdivision (b)(6) applies, " ' "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." ' " (*In re William B*. (2008) 163 Cal.App.4th 1220, 1227.) The parent then bears the burden "to change that assumption and show that reunification would serve the best interests of the child." (*Ibid*.) The parents burden to do so requires clear and convincing evidence that reunification is in the child's best interest. (§ 361.5, subd. (c)(2).)

We review under the substantial evidence standard the juvenile court's ruling that section 361.5, subdivision (b)(6), applies to preclude reunification services. (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121-1122.) We do not make credibility determinations or reweigh the evidence but " 'review the entire record in the light most favorable to the trial court's findings to determine if there is substantial evidence in the record to support those findings.' " (*Ibid*.) We review the juvenile court's ultimate determination as to whether reunification services are in the child's best interests for abuse of discretion. (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1140-1141.)

Citing section 361.5, subdivision (k), Father faults the court for not making adequate findings to support bypassing reunification services. That subdivision requires the court to "read into the record the basis for a finding of severe sexual abuse . . . under paragraph (6) of subdivision (b), and [the court] shall also specify the factual findings used to determine that the provision of reunification services to the offending parent . . .

13

would not benefit the child." (§ 361.5, subd. (k).)  With these requirements, "section 361.5, subdivision (b)(6) is different than the other bypass provisions." (*In re T.R.* (2023) 87 Cal.App.5th 1140, 1149.)  That is, in addition to requiring the juvenile court to find, as a predicate for denying reunification services, that the parent engaged in harmful conduct such as severe sexual abuse, the statute "requires an *additional finding* (that the child 'would not benefit') and the court must state for the record *the bases for both findings*." (*Ibid.*)

The juvenile court did not err.  Unlike in *In re T.R.*, *supra*, the court here did not fail to state the required findings and its findings were more than sufficient on a record that amply supported the bypass provision.  As noted, the court identified digital penetration as the requisite severe sexual abuse (§ 361.5, subd. (b)(6)), and Father does not contest the court's finding by clear and convincing evidence that he committed those acts.

The court's best interests findings were similarly more than adequate, satisfying section 361.5, subdivision (k)'s express findings requirement.  Indeed, they precisely tracked the six express best interest considerations outlined in subdivision (i).  In particular, the court identified:  (1) the "specific act or omission comprising the severe sexual abuse" (digital penetration of one of his teen daughters), and (2) the "circumstances under which the abuse or harm was inflicted" (i.e., it was "predatory" abuse commencing when his daughter turned 15, using grooming behaviors such as purportedly "looking for hickeys" and requiring her to wear certain clothing to facilitate

14

his abuse, which he perpetrated "when people were sleeping or in a car away from everyone so that [Y.B.] could not get help"). (§ 361.5, subd. (i)(1) & (2).)

Further, the court found regarding the third factor that the "severity of the emotional trauma" Y.B. suffered was very high. As to this factor, the court found that "though she testified very calmly, [Y.B.] at times broke down showing severe emotional trauma" and further that, in the atmosphere Father created in the home, Y.B.'s "sisters in the report said [she] lies," which "intensif[ied] her emotional trauma." (§ 361.5, subd. (i)(3).)

The court did find on the fourth and sixth factors that there was no "history of abuse of other children" before Y.B. turned 15 years old (notably the same age as L.B. at the time of the hearing) and that, per the statutory language, L.B. "desires to be reunified with the offending parent." (§ 361.5, subd. (i)(4) & (6).) In light of the other factors the court identified, however, the court concluded that there was no "likelihood [of] safely return[ing]" L.B. "to the care of the offending parent . . . within 12 months with no continuing supervision" (*id.*, subd. (i)(5)), given the "the predatory act of abuse displayed by Father."

Under well-established caselaw, these findings were more than sufficient to support the court's decision that it was not in L.B.'s best interests to provide Father reunification services. (See *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 970 (*LA County CFS Dept.*) ["aberrant sexual behavior directed at one child in the household places other children in the household at risk, and this is especially so when both children are females"]; see also

15

*ibid.* [risk to other siblings may increase when "[t]he object of [Father's] predatory actions, [Y.B.], is no longer available"]; *In re P.A.* (2006) 144 Cal.App.4th 1339, 1347 ["any younger sibling who is approaching the age at which the child was abused, may be found to be at risk of sexual abuse"]; *In re Karen R.* (2001) 95 Cal.App.4th 84, 90 [sexual abuse of a sibling poses a danger of substantial harm to all the children in a household]; *In re Rubisela E.* (2000) 85 Cal.App.4th 177, 198 [household "web of denial" regarding sexual abuse portends emotional harm for other siblings]; cf. *In re Kieshia E.* (2000) 6 Cal.4th 68, 77 ["When a parent abuses his or her own child, or permits such abuse to occur in the household, the parent also abandons and contravenes the parental role"].)

Father's remaining arguments all fail under the standard of review. He cites evidence he believes is favorable to his view that L.B.'s best interests lie in reunification services with him. But the cardinal rule of appellate review is that we do not speculate whether the dependency court might have reached a different conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) Instead, the reviewing court must view the evidence in the light most favorable to the trial court's ruling, resolve all conflicts in favor of the ruling, and make all reasonable inferences in favor of the decision below. (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1164.) In sum, we must " 'accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.' " (*In re J.F.* (2014) 228 Cal.App.4th 202, 209.)

The record similarly flatly contradicts many of Father's claims. He asserts the court did not consider the strength of his bond with L.B., given that she wanted to return

16

to his care. But the court expressly acknowledged her desire to return home and yet could reasonably conclude it was not in her best interests. Father's willingness to violate his parental bond with Y.B., cast her as a liar when he was the habitual deceiver, and embroil L.B. and the whole family in a traumatizing web of denial all supported the juvenile court's ruling.

Father alleges CFS merely cut-and-pasted claims of risk of harm to L.B. from its allegations that Father abused Y.B., when there was no evidence that he targeted LB. He argues L.B. was not similarly situated to Y.B. But in addition to the indirect emotional and developmental harm Father caused L.B. by raising her in a household of incest and deceit, the juvenile court could reasonably find specious Father's distinctions regarding a likelihood of direct incest. This was particularly true where L.B. was the same age, gender, and family relation Father already showed he would abuse. While Y.B. entered the household later, she was still Father's daughter. He nevertheless transgressed that boundary. The juvenile court could reasonably find Father's fine parsing of a likelihood of incest disingenuous and unpersuasive. The court properly rejected it as "contrary to the holdings and language of the cases that suggest sexual abuse of one child in the household puts at risk other children in the household. As one authority has written, ' "Incest,' as used herein encompasses not only sexual relations between a child and a biological parent, but also between a child and an adult who has assumed a parenting role towards the child, whether that adult is married or cohabits with the child's parent . . . . (Wilson, *The Cradle of Abuse: Evaluating the Danger Posed By A Sexually Predatory*

17

*Parent To The Victim's Siblings* (2002) 51 Emory L.J. 241, fn. 1.)" (*LA County CFS Dept.*, *supra*, 215 Cal.App.4th at p. 970.)

Father's bid for reversal by suggesting the juvenile court was disoriented as to the proceedings is wholly without merit. Father points to the court's statement: "Maybe it wasn't another case. Didn't you ask me for something similar last time? [¶] I don't know if it was this case." Counsel for CFS counsel responded, "It's a different case. I'm on it as well." This innocuous, everyday exchange between the court and counsel on a busy calendar was in regard to Y.B.'s mother's counsel asking the court to authorize another round of therapy. It had nothing to do with Father and is of no significance to his appeal.

Similarly unavailing is the fact that the court in making its ruling, stated that it was "factoring in [Y.B.]'s testimony which the court found very credible, as well as I believe a sibling or half-sibling who testified as well, if I'm not mistaken." Father asserts that the "judge was mistaken" since "no sibling" of Y.B. *testified*. The misleading precision Father attaches to "testimony" is unwarranted. To the contrary, the court's comment reflects that it was "factoring in" L.B.'s stipulated testimony and found it insufficient to warrant reunification services for Father. There was no error nor anything to impugn the court's ruling. Likewise, the fact that the court stated it found "beyond a reasonable doubt" that reunification would not be in L.B.'s best interests, rather than by clear and convincing evidence (§ 361.5, subd. (b)(6)), in no way aids Father's challenge. We presume the court's reference to the higher standard was for effect (Evid. Code, § 664), to demonstrate CFS exceeded its initial burden to show reunification was not in L.B.'s best

interests and that Father did not rebut that conclusion.  None of Father's appellate challenges has any merit.

## DISPOSITION

The juvenile court's order denying Father reunification services is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____

Acting P. J.

We concur:

CODRINGTON_____

J.

RAPHAEL_____

J.